GULF, MOBILE AND OHIO RAILROAD
COMPANY, Plaintiff-Appellee
Cross-Appellant,

v.

UNITED STATES of America, Defendant-Appellant Cross-Appellee.

No. 73–3409.

United States Court of Appeals,
Fifth Circuit.

Sept. 5, 1978.

Scott P. Crampton, Asst. Atty. Gen., Meyer Rothwacks, Chief, Donald B. Craven, John P. Downes, Tax Div., Refund Trial Section # 2, U. S. Dept. of Justice, Washington, D. C., Charles S. White-Spunner, Jr., U. S. Atty., Mobile, Ala., Gilbert E. Andrews, Ernest J. Brown, Attys., Tax Div. Dept. of Justice, Washington, D. C., for defendant-appellant-cross-appellee.

W. A. Kimbrough, Mobile, Ala., Robert T. Molloy, James L. Boring, Vienna, Va., for plaintiff-appellee-cross-appellant.

Before BROWN, Chief Judge, WISDOM and GEWIN, Circuit Judges.

JOHN R. BROWN, Chief Judge:

The issue in this tax refund case is whether Gulf, Mobile & Ohio Railroad Company (GM&O) can receive a deduction for original issue discount on the exchange of debentures for its own preferred stock. Or, in other words, is this case distinguishable from *Commissioner v. National Alfalfa Dehydrating & Milling Co.*, 1974, 417 U.S. 134, 94 S.Ct. 2129, 40 L.Ed.2d 717? The District Court held that a deduction for discount should be allowed, and we affirm. We disagree, however, with the lower court's measurement of the discount.

### The Bare Facts

The preferred stock involved in this exchange was originally issued in 1940 pursuant to a plan of reorganization for three railroads. The Mobile and Ohio Railroad Company, which had been operated by court appointed receivers since 1932, was combined with the Gulf, Mobile and Northern Railroad Company and the New Orleans Great Northern Railroad Company to form the GM&O.[1]

In 1956, GM&O received permission from the Interstate Commerce Commission (ICC) to issue 5% income debentures to be exchanged on a voluntary basis for up to 283,438¼ shares of GM&O's outstanding preferred stock. One income debenture in principal amount of $100 was to be traded for one share of preferred stock with a stated value of $100. GM&O would then cancel the stock. The 5% interest on the income debentures was payable currently,

---

1. Under the reorganization plan, a committee of the Mobile & Ohio (M&O) receivership acquired the properties of M&O by foreclosure. These properties were then conveyed to the recently organized GM&O. The Gulf, Mobile and Northern (GM&N) then consolidated with GM&O. Holders of GM&N preferred and common stock received preferred and common stock of GM&O. The New Orleans Great Northern, which was controlled under a lease by GM&N, was not merged with GM&O, but its debenture holders were offered GM&O preferred stock, and its common stockholders were offered GM&O common stock. See *Gulf, M. & O. R.R. Merger*, 1939, 236 I.C.C. 61, 68–71.

only if earned, and cumulative interest was limited to 15%. Dividends on the preferred stock were payable at the rate of $5 per share per annum declared by the board of directors and were cumulative, subject, however, to certain limitations.

GM&O advised the ICC that the primary purpose of the exchange offer was to enable the corporation to save on taxes.[2] Payment of interest on the debentures would be deductible, unlike the dividend payments on the preferred stock. The ICC approved the exchange, and subsequently, GM&O issued a total of 187,116 income debentures in exchange for a like amount of shares of preferred stock from December 31, 1957, through December 31, 1962.[3] During this period, the preferred stock and income debentures were listed and traded on the New York Stock Exchange.

GM&O later filed for a tax refund for the years ending December 31, 1959 and 1961, based on a deduction for the amortizable bond discount arising from the exchange of the debentures for the preferred stock.[4] Discount of $6,842,507.56 was computed by subtracting the total market value of the preferred stock ($11,869,092.44) during the

2. Exh. 1 to J. Exh. 1 at 2.

3. GM&O was never able to exchange all the 283,438¼ shares of outstanding preferred stock for debentures. See note 21, infra.

4. The Internal Revenue Code at the time of this exchange did not specifically provide for a deduction for discount on the exchange of bonds for preferred stock. Section 163(a) of the Code, however, did allow corporations and individuals to deduct all interest paid or accrued within the taxable year. 26 U.S.C.A. § 163(a). The regulations pertaining to this statute stated:

> If bonds are issued by a corporation at a discount, the net amount of such discount is deductible and should be prorated or amortized over the life of the bonds. For purposes of this section, the amortizable bond discount equals the excess of the amount payable at maturity (or, in the case of a callable bond, at the earlier call date) over the issue price of the bond.

26 C.F.R. § 1.163(a). The parties agree that if the debentures had been issued for cash, in the amount of the selling price of the preferred stock at the time of exchange, the discount would be proper under the relevant statutes and regulations. 339 F.Supp. at 490. Thus, GM&O argues that the preferred stock-for-bonds exchange should be treated the same as a cash-for-bonds transaction.

In 1969, Congress amended the Internal Revenue Code to clarify the result on an exchange of bonds for property. The statute defined issue price for bonds and other evidence of indebtedness that were exchanged for property after May 27, 1969. Tax Reform Act of 1969, Pub.L. 91–172, § 413(b), 83 Stat. 611. The relevant statute now provides in pertinent part:

> In the case of a bond or other evidence of indebtedness, or an investment unit as described in this paragraph (other than a bond or other evidence of indebtedness or an investment unit issued pursuant to a plan of reorganization within the meaning of section 368(a)(1) or an insolvency reorganization . . .), which is issued for property and which—
> (A) is part of an issue a portion of which is traded on an established securities market, or
> (B) is issued for stock or securities which are traded on an established securities market,
> the issue price of such bond or other evidence of indebtedness or investment unit, as the case may be, shall be the fair market value of such property. Except in cases to which the preceding sentence applies, the issue price of a bond or other evidence of indebtedness (whether or not issued as a part of an investment unit) which is issued for property (other than money) shall be the stated redemption price at maturity.

26 U.S.C.A. § 1232(b)(2).

Since the debentures in this case were issued before 1969, the amended statute does not apply. Nevertheless, we think it is appropriate to mention that the considered legislative judgment is now to recognize bond discount in non-cash exchanges. The legislative history also shows that Congress regarded the amendment more as a clarification measure than an innovative one:

> In order to clarify the situations in which original issue discount may arise, the bill further provides that there may be original issue discount when a corporation issues a bond for a price less than its face value whether it receives cash, stock, or other property (including the assets of another corporation) for the bond. In the case where a bond is issued for property, it is provided that the issue price of the bond is to be the fair market value of the property.

S.Rep.No. 91–552, 91st Cong., 1st Sess., [1969] U.S.Code Cong. & Admin.News, pp. 2027, 2180.

The Government argues, however, that under the present statute no discount would be allowed in this case because the exchange is a "reorganization within the meaning of section 368(a)(1)." 26 U.S.C.A. § 1232(b)(2). The taxpayer vigorously denies that this is a reorgani-

exchange period[5] from the total principal amount of the debentures ($18,711,600.00). The IRS disallowed the claim, and GM&O filed this action for a refund. In a decision prior to *National Alfalfa,* the District Court held for the taxpayer, S.D.Ala., 1972, 339 F.Supp. 489.

### Absolute Ban Rejected

In *National Alfalfa,* pursuant to a recapitalization plan to eliminate arrearages on preferred shares,[6] the taxpayer corporation required its shareholders to exchange their $50 par 5% cumulative preferred shares for $50 face value 5% sinking fund debentures. The taxpayer claimed a discount on the difference between the fair market value of the stock and the face amount of the debentures. The Tenth Circuit held in favor of the taxpayer, but the Supreme Court reversed.

The decision produced a flood of commentary.[7] All the authorities, unfortunately, as well as counsel in this case, agree that *National Alfalfa* is difficult to interpret, to say the least. But difficult or not, it is our duty—without divine prescience—to divine and then apply it.

The Government argues that *National Alfalfa* establishes an absolute rule that no discount can occur when a corporation issues bonds for its own preferred stock. The exchange of bonds for stock, the Government contends, is nothing more than an adjustment of the corporation's capital accounts in which no new capital is acquired. Discount can occur only if a corporation acquired new capital in exchange for its bonds. The assets side of the balance sheet must be adjusted before there can be discount. In a stock-for-bonds exchange, only the liability and equity accounts are altered.[8]

■ The Government finds support for its argument in Part IV of *National Alfal-*

---

zation because no continuity of equity interest exists on the exchange of preferred stock for debentures. The District Court made no finding on this issue, and we need not decide it now.

5. For an explanation of how the District Court computed market value, see text accompanying notes 26–27.

6. *National Alfalfa Dehydrating & Milling Co. v. Commissioner,* 1971, 57 T.C. 46, 47–48, *rev'd,* 10 Cir., 1973, 472 F.2d 796, *rev'd,* 1974, 417 U.S. 134, 94 S.Ct. 2129, 40 L.Ed.2d 717.

7. Wolf, *Original Issue Discount: Before and After* National Alfalfa, 28 Tax Lawyer 325 (1975); Rockler, Greisman, and Hubbard, *Status of Amortizable Bond Discount after* National Alfalfa *case,* 41 J.Tax. 134 (1974); Denburg, *Amortization of Bond Issue Discount: The Supreme Court decides* National Alfalfa, 52 Taxes 409 (1974); Scheff, *Purchase and Sale of Company Debt or Equity at Depressed Prices; Going Private; Related Party Transactions; Original Issue Discount,* in 34th N.Y.U. Annual Institute on Federal Taxation 579 (S. Reiner ed. 1976); Denburg, *Bonds and Other Evidence of Indebtedness—Section 1232,* Tax Mngm't Port. 333 (BNA) (1976); Note, *The Original Issue Discount Deduction in Bonds-for-Noncash Property Exchange,* 27 Vand.L.Rev. 1179 (1974); Tax Mngm't Memo 74-24 (BNA) (Nov. 25, 1974); Tax Mngm't Memo 73-10 (BNA) (May 14, 1973). *See also* Asimov, *The Interest Deduction,* 24 U.C.L.A.L.Rev. 749 (1977); De

Kosmian, *Original Issue Discount,* 22 Tax Lawyer 339 (1969).

8. The Government contends that our decision in *Claussen's, Inc. v. United States,* 5 Cir., 1972, 469 F.2d 340, supports its "new capital" test for bond discount. In *Claussen's,* a recapitalization plan provided that each share of common stock would be exchanged for (i) one-third share of new common, (ii) a stock purchase warrant for two-thirds share of new common, and (iii) one $10 face value 6% debenture. This Court disallowed any claim for discount on the issuance of the debentures because "there was no 'borrowing' sufficient to give rise to bond discount." *Id.* at 344. We distinguished the transaction, however, from an exchange of bonds for *preferred* stock. In fact, the opinion specifically refers to the *GM&O* case:

> In each of the cases cited by [the] taxpayer [*GM&O*] in support of its position, the security holders involved held a radically different form of participation in the reorganized corporate enterprise than they had held prior to reorganization.

*Id.* at 343 n.9. Unlike the situation in *GM&O,* the "truly distinguishing feature" of *Claussen's* is that the shareholders received common stock *"in direct proportion to their original equity in the corporation[s]." Id.* at 343 (emphasis in original). *See* Note, *The Original Issue Discount Deduction in Bonds-for-Noncash Property Exchanges,* 27 Vand.L.Rev. 1179, 1198–99 (1974).

*fa.* This section does mention "new capital", but the gist of Part IV is concerned with whether the taxpayer incurred any additional cost for the use of capital.[9] Indeed, the Court earlier in the opinion stated that "the relevant inquiry in each case must be whether the issuer-taxpayer had incurred as a result of the transaction[s], some cost or expense of acquiring the use of capital." 417 U.S. at 147, 94 S.Ct. at 2136. In Part IV the Court explained that the transaction in *National Alfalfa* was merely a swap of one form of investment for another that was identical in every significant feature. The face amount of the debentures equalled the stated value of the stock; the fixed interest on the debentures was equal to the cumulative dividend on the preferred; and the sinking fund provisions for both the preferred and the debentures were comparable. *Id.* at 153–54, 94 S.Ct. 2129. The "cost of the capital invested in the corporation was the same whether represented by the preferred or by the debentures, and was totally unaffected by the market value of the shares received at the time of the issuance of the debentures." *Id.* at 154, 94 S.Ct. at 2140. Thus, the controlling test from *National Alfalfa* is whether "some cost . . . of acquiring the use of capital" occurred, not whether additional capital was acquired.

Our interpretation, furthermore, is supported by the Supreme Court's emphasis in Part III of the opinion on the failure to prove market values for the stock and debentures. The Court explained that the record in *National Alfalfa* did not indicate the cash price at which the debentures could have been sold in the market had they been offered for sale. Neither did the record reveal the price at which the stock could have been purchased in the impending exchange. The Court concluded that the "claimed fair market value of both securities is somewhat artificial since the exchange is effectively insulated from market forces by the intracorporate and private nature of the transaction." *Id.* at 150, 94 S.Ct. at 2138. Consequently, "the requisite evaluation of the property to be exchanged cannot occur in this intracorporate transaction and debt discount cannot be determined." *Id.* at 151, 94 S.Ct. at 2138.[10] If the Government's "new capital" test was adopted, Part III of *National Alfalfa* would be an exercise in futility. It would make little difference what factual proof of discount might be presented if no discount could arise in a bonds-for-stock exchange.

■ Along with the Second Circuit, therefore, we refuse to read *National Alfalfa* as establishing an absolute ban on discount when a corporation exchanges its bonds for its own preferred stock. *Cities Service Co. v. United States*, 2 Cir., 1974, 522 F.2d 1281, *cert. denied*, 1975, 423 U.S. 827, 96 S.Ct. 43, 46 L.Ed.2d 43.[11] In *Cities Service*, the corporate taxpayer, a public utility, was required to simplify its capital structure under the so-called "death sentence" provision of § 11(e) of the Holding Company Act, 15 U.S.C.A. § 79k(e). The reorganization plan, which was approved by the Securities and Exchange Commission, provided for the issuance of new debentures in exchange for all of Cities preferred stock. The aggregate face amount of the new debentures was equal to the stated value of

---

9. The Supreme Court reversed the Tenth Circuit in a 9–0 decision; however, Justice Stewart dissented from Part IV of the opinion.

10. The Supreme Court cited for comparison the District Court opinion in *GM&O*, S.D.Ala., 1972, 393 F.Supp. 489, as well as another District Court decision from the Fifth Circuit, in which discount was allowed after the parties conducted "arms length negotiations" to establish the amount of debentures and stock to be exchanged. *Southern Fertilizer & Chem. Co. v. Edwards*, M.D.Ga., 1955, 167 F.Supp. 879.

11. For commentary on *Cities Service*, see 9 Ga.L.Rev. 990 (1975) [hereinafter cited as Georgia Note]; 42 J.Tax. 200 (1975).

The *Cities Service* case spawned four lower court opinions from the S.D.N.Y. The first was by then District Judge Mansfield, 1970, 316 F.Supp. 61. The second was by Judge Wyatt, 1971, 330 F.Supp. 421, and final judgment prior to appeal was entered by Judge Tenney, 1973, 362 F.Supp. 830. Following remand from the Second Circuit, Judge Tenney authored the last opinion in 1978. 443 F.Supp. 392. See note 24, *infra*.

the preferred, plus the call premiums and the dividend arrearages that had been accumulated over 14 years.

The Second Circuit held that a discount should be allowed because Cities incurred an additional cost for the use of capital. First, the face amount of the debentures was greater than the stated value of the preferred, and second, the original issue price of the preferred stock was less than the face amount of the debentures. 522 F.2d at 1288. Thus, the preferred shares and the debentures were not identical as they were in *National Alfalfa*. Market values for the stock and the debentures also were readily available in *Cities Service* since both were traded on market exchanges.[12]

### Does It Smell Like Alfalfa?

Three significant distinctions set this case apart from *National Alfalfa*. First, as in *Cities Service*, the original value received by GM&O for each preferred share was less than the face amount of the debentures. The District Court, after a thorough

examination of the evidence, found that the original consideration for the preferred stock was approximately $9.50 to $11.00 per share.

The Government argues that the District Court should have accepted the 1939 ICC finding that the consideration received for each preferred share was its stated value of $100.[13] The District Court in this tax case, however, is not inextricably bound by the ICC's valuation of a particular stock in a railroad reorganization, especially if it is found that the Commission did not consider all relevant factors. The lower court explained that the ICC valuation "was based upon the book value of the assets being purchased by the GM&O. While an evaluation of assets at the time of the exchange might be persuasive to the court, a valuation based upon the generally unrealistic book value is deemed to be of little or no probative value and is not persuasive here." R. at 258. In *Cities Service*, for example, the Securities and Exchange Commission had determined that the exchange of debentures for preferred stock was "fair and

12. *Fed-Mart Corp. v. United States*, S.D.Cal., 1975, 75–2 U.S.T.C. ¶ 9531, aff'd, 9 Cir., 1978, 572 F.2d 235, is the only other case subsequent to *National Alfalfa* that has squarely faced the problem of discount on a stock-for-bonds exchange. In *Fed-Mart* debentures were issued in return for outstanding common stock. The taxpayer claimed a discount for the difference between the face value of the debentures and their fair market value at the time of issuance. Although the District Court rejected the claim, it implicitly endorsed the idea that such a discount could arise under the proper facts. The taxpayer in *Fed-Mart*, however, failed to prove the market value of the debentures, which were not actively traded. Experts testified on their value, but the Court held the testimony to be mere "speculation." The District Court also found an absence of additional cost of capital since an exchange of debentures for common stock would increase the issuer's financial leverage and earnings and result in a savings on capital.

In affirming the lower court, the Ninth Circuit held that, regardless of the "propriety of allowing a deduction for debt discount in cases involving an exchange of debentures for the issuer's own stock," discount could not occur in this case because market values were a matter of "pure speculation." 572 F.2d at 237.

The Eighth Circuit in a brief discussion on whether collateral estoppel barred a taxpayer

from relitigating a debt discount issue also mentioned that under *National Alfalfa* discount is possible "if the net amount received by the corporation upon original issue of the old bonds or stock *was less than* the maturity value of the new bonds." *United States v. St. Louis-San Francisco Ry. Co.*, 8 Cir., 1976, 537 F.2d 312, 317.

13. For example, in *Missouri Pacific R.R. v. United States*, 1970, 433 F.2d 1324, 193 Ct.Cl. 257, the taxpayer claimed a discount on the exchange of bonds for preferred stock in a railroad reorganization. The ICC specifically found that a preferred share "worth $250" was the "equitable equivalent" of a bond with a maturity value of $216. The Court of Claims accepted that finding and refused to allow any discount because the bonds and shares were equivalent when exchanged.

In this case, however, we are not faced with a specific ICC finding in 1957 that the debentures were equivalent to the preferred stock. Instead, the lower court had to determine whether an ICC finding in 1939 that the stated value of a preferred share was $100 means that the preferred share is equivalent to a debenture issued in 1957 with a maturity value of $100. Even under *Missouri Pacific*, it is unclear how the Commission would resolve this question.

equitable to all parties and the debentures were the 'equitable equivalent' of the rights surrendered," but the District Court refused to accept the finding that the debentures were worth their face value at the time of issuance. *Cities Service Co. v. United States*, S.D.N.Y., 1970, 316 F.Supp. 61, 68 (Mansfield, J.). Even in a railroad merger, the ICC's overall findings on valuation are still subject to challenge, e. g., *Schwabacher v. United States*, 1948, 334 U.S. 182, 201–02, 68 S.Ct. 958, 92 L.Ed. 1305, 1317 (ICC valuation rejected in a rail merger because Commission failed to consider rights of minority shareholders under state law). The District Court based its finding of the original issue price on substantial evidence, including market prices of the stocks, the earnings record of the constituent corporations, the value of assets received, and even an Internal Revenue Service report on the value of the assets in the GM&O merger.[14] We do not find the District Court's conclusion clearly erroneous within the meaning of F.R.Civ.P. 52(a). And since the original value received for the preferred shares was

much less than the $100 face amount of the bonds, there was an additional cost for the use of capital.

GM&O also incurred a cost of borrowing for a second reason. In the Exchange Offer to the shareholders, GM&O explains that, unlike the preferred stock, the debentures would give holders the benefit of a sinking fund.[15] Although to some investors this distinction may seem insignificant, the Supreme Court in *National Alfalfa* stated that the change in the corporate structure in that case was inconsequential, in part, because the "sinking fund provisions for both the preferred and the debentures were comparable." 417 U.S. at 154, 94 S.Ct. at 2139.[16] Since in this case only the debentures have a sinking fund provision, the exchange of debentures for the preferred stock was not a mere "substitution" of one form for another that "did not create an obligation to pay in excess of an amount previously committed." *Id.*[17] Instead, GM&O at least to this extent incurred an

14. In 1942, the Internal Revenue Service considered the tax consequences of the GM&O reorganization and found the basis of the M&O properties received in the exchange for preferred stock was less than the stated value of the stock. J. Exh. 10; R. at 258.

15. The Exchange Offer stated that the preferred shareholders would lose their voting rights but would receive the following benefits:
    (a) the Series A Debentures will have priority over all classes of stock in respect of principal, interest and sinking fund requirements;
    (b) interest on the Series A Debentures will be mandatorily payable when earned and will be cumulative to the extent of 15% of principal amount, if not earned, whereas dividends on the Preferred Stock are payable in the discretion of the Board of Directors and are cumulative in respect of any year only to the extent that such dividends are earned and not paid; and
    (c) the Series A Debentures have the benefit of an annual sinking fund, whereas there is not any sinking fund applicable to the Preferred Stock.
J. Exh. 19 at 5.

16. Sinking funds are created to "provide funds for the payment of principal not only by periodic partial redemption but also for the periodic retirement of serial bonds or for the payment of securities at maturity. . . . The use of a

sinking fund will increase the safety of an issue by reducing the amount of the bonds outstanding and by providing funds for their repayment." H. Henn, Law of Corporations 287 n.29 (1970).

Although some question the protective value of a sinking fund for an investor, 1 A. Dewing, The Financial Policy of Corporations 250 (5th ed. 1953), the requirement for such a fund does increase the market price of the bonds because "[t]he regular and imperative demand of the sinking fund trustees always affords a market for at least some of the bonds. This is particularly true if the issue is small and likely to command only a limited market." *Id.* at 239. The existence of a sinking fund provision also is considered a factor in distinguishing debt from equity. Asimov, note 7, *supra*, at 777; Plumb, *The Federal Income Tax Significance of Corporate Debt: A Critical Analysis and a Proposal*, 26 Tax L.Rev. 369, 469 (1971). *E. g., 1661 Corp. v. Tomlinson*, M.D.Fla., 1965, 247 F.Supp. 936, 937, *aff'd*, 5 Cir., 1967, 377 F.2d 291.

17. *See* Rockler, note 7, *supra*, at 138 ("Part IV [of *National Alfalfa*] should be regarded as applicable only in the narrow circumstances . . . where the bonds and stock were identical in face amounts and rate of return and closely similar in other aspects (e. g., sinking fund provisions)").

additional cost for the use of capital by requiring a sinking fund for the debentures only.[18]

Finally, and perhaps most importantly, this case is distinguishable from *National Alfalfa* because the exchange of debentures for preferred stock was completely voluntary and was affected by market forces.[19] In *National Alfalfa*, an amendment to the articles of incorporation required the preferred shareholders to exchange their shares for debentures or else have "all rights and privileges" cease. *National Alfalfa*, 10 Cir., 1973, 472 F.2d 796, 798 n.1. The Supreme Court emphasized that the "cost of the capital invested in the corporation was . . . totally unaffected by the market value of the shares received at the time of the issuance of the debentures." 417 U.S. at 154, 94 S.Ct. at 2140. Indeed, even in *Cities Service*, the exchange transaction was insulated to some extent from the market because it was required by statute.

In this case, however, while perhaps hoping for but without expecting all shareholders to participate, GM&O made an offer to sell, in effect, its debentures at a certain price, i. e., a stipulated amount of preferred stock.[20] Both the stock and the debentures were traded on the New York Stock Exchange. The market values for these two GM&O obligations could be determined by anyone with a *Wall Street Journal.* We could assume that stockholders chose to participate in the exchange out of kindness for GM&O. Where market prices are clear, however, and the exchange is voluntary, it is economically more logical to assume that before deciding to trade the preferred shareholders compared the value of their stock to the value of the debentures in light of market prices and their own personal preferences. Some preferred shareholders then decided to trade, some did not. In fact, as late at 1971, over 63,000 preferred shares still had not been exchanged.[21] Thus, unlike the transaction in *National Alfalfa* that was insulated from market forces, the success of this exchange was influenced by the "exigencies of the competitive money market." 417 U.S. at 151, 94 S.Ct. at 2138.

### Measure For Measure

In a sale of debentures for cash, discount is measured by the difference in

---

**18.** If all holders of preferred stock accepted the exchange offer, the maximum sinking fund requirements from annual earnings would have been $70,860.00. J. Exh. 19 at 5.

**19.** We recognize that some exchanges involving preferred shareholders are only euphemistically styled as "voluntary." If, for instance, preferred stock has accumulated large arrears of undeclared and unpaid dividends, it is not uncommon for corporations to offer to exchange the old preferred for new preferred shares that have no arrears but have a claim to future dividends prior to that of the old preferred. If future earnings are expected to be sufficient to pay only dividends on the prior preferred, the old preferred will be forced to convert or else receive nothing. Note, *A Standard of Fairness for Compensating Preferred Shareholders in Corporate Recapitalizations*, 33 U.Chi.L.Rev. 97, 99 (1965). *See generally* V. Brudney & M. Chirelstein, Corporate Finance 189–239 (1972). In this case, the primary purpose of the exchange was to save on taxes, not to eliminate arrearages. See text at note 2 *supra*. For a discussion of the reasons why a corporation will exchange bonds for stock, see Note, note 8, *supra*, at 1181–85.

**20.** GM&O had to convince the ICC that the exchange was worthwhile, if as few as one-third of the preferred shareholders accepted the offer. Exh. 1 to J. Exh. 1 at 7–8.

**21.** Def. Exh. NN at 2 (Gov't expert's valuation report). Following GM&O's merger with the Illinois Central R.R. Co. in 1972, all outstanding preferred stock was retired at the call price of $100 per share in cash. *Id.*

As of December 31, 1964, the last pertinent time period for this case, GM&O had received and cancelled 187,116 shares of its preferred stock. Thus, more than 96,000 shares remained outstanding. The breakdown of the exchanges on an annual basis indicates the ambivalent attitude the preferred shareholders had towards the exchange:

1957 – $85,200 in debentures issued for 852 shares
1958 – $12,653,000 in debentures issued for 126,530 shares
1959 – $337,800 in debentures issued for 3,378 shares
1960 – $1,046,300 in debentures issued for 10,463 shares
1961 – $3,767,300 in debentures issued for 37,673 shares
1962 – $822,000 in debentures issued for 8,220 shares
1963 – no exchanges
1964 – no exchanges

J. Exh. 1 at ¶ 18.

the face amount of the debentures and their issue price. In a free market exchange of bonds for property, however, the issue price of the debenture should equal the market value of what the corporation got for the debenture.[22] In this case, GM&O gave up one debenture to obtain one share of preferred stock. The market value of the preferred share, therefore, should correspond to the issue price of the debenture.[23]

In *Cities Service* the Second Circuit directed the District Court on remand to determine the issue price by the market value of the debentures, rather than the market value of the preferred stock.[24] The Court explained that "an equivalence in value of the debentures and preferred shares might be assumed if the debentures were issued for cash and/or property in the marketplace," 522 F.2d at 1290, but it concluded:

> Any assumption of an equivalence of the debentures and the preferred is unjustified where the transaction is insulated from the marketplace since the market forces which normally would bring about an equivalence of the two are absent. Here there is no proof that the two were equal.

*Id.* In *Cities Service* the amount of securities the preferred shareholders received in exchange for the debentures was determined after SEC hearings and bargaining of the parties. But each preferred shareholder had no choice about accepting the final formula.

In contrast, the voluntary exchange in this case was influenced by the market. The holders of preferred shares could examine the published market prices for both the preferred and the debentures before deciding to trade. Thus, the market value of the preferred shares is a good yardstick for determining the real issue price of the debentures.[25]

---

**22.** *See, e. g., Bader v. United States*, D.C.Ill., 1959, 172 F.Supp. 833, 836 ("price at which property would change hands between a willing buyer and a willing seller, neither of whom is under any compulsion to buy or sell and both of whom are reasonably well informed as to the facts having a bearing on value"). *See also United States v. Cartwright*, 1973, 411 U.S. 546, 551–52, 93 S.Ct. 1713, 36 L.Ed. 528, 533–34.

**23.** *Cf.* 26 U.S.C.A. § 1232(b)(2) ("the issue price of such bond . . . shall be the fair market value of such property"). See note 4, *supra.*

**24.** On remand the parties agreed that the fair market value of the debentures was $105,355,-293. This was between the aggregate closing market price of the preferred shares ($104,827,-450) on the day of the debenture issue and the aggregate closing market price of the debentures ($105,883,135). *Cities Service Co. v. United States*, S.D.N.Y., 1978, 443 F.Supp. 392.

**25.** Before computing the discount, the District Court applied a two-tier test:

> The measurement of bond discount shall be the difference between the issue price originally received by taxpayer for the preferred stock and the par value of the bonds, except if it can be shown that the fair market value of the preferred stock at the time of the exchange was greater than the issue price. Then, the bond discount shall be the difference between the fair market value of the preferred stock and the par value of the bonds. Provided however, that no bond discount shall exist if either the issue price or the fair market value of the preferred stock exceeds the par value of the bonds.

339 F.Supp. at 498. This standard has been called the two-tier approach because it considers both the original consideration for the preferred stock and its fair market value at time of the exchange. The test was first formulated in the initial District Court opinion in *Cities Service*, S.D.N.Y., 1970, 316 F.Supp. 61. The theory behind this approach is that discount arises only if the corporation actually suffers a cost for the use of capital. Thus, if the original consideration for the preferred stock equals the face amount of the debentures or if the preferred stock had a fair market value at the time of exchange equal to the face amount of the debentures, no cost will be incurred by the corporation and hence no debt discount will arise.

In this case, the original consideration for the preferred stock was much less than the face amount of the debentures or the market value of the preferred. As already explained, the District Court found that the original consideration for the stock was between $9.50 and $11.00, and its market value when exchanged was $80. Thus, the amount of discount was the difference between the $100 face amount of the debenture and its issue price as represented by the $80 market value of the preferred stock.

The idea, however, that discount is dependent on the original consideration for the stock is criticized for conflicting with the theory that discount is a cost of borrowing, e. g., Georgia Note, note 11, *supra* at 1002–03. Indeed, the Government argues, in the alternative, that the

### Jousting In The NYSE Lists

GM&O questions, however, the lower court's determination of the value of the preferred shares. The parties stipulated that the preferred stock was actively traded on the New York Stock Exchange (NYSE). The mean NYSE price during the exchange period was $55.25 per share.[26] Taxpayer's expert, however, fixed the fair market value during the exchange period at $70.00 per share, while the government expert estimated the value at $121.58 per share. The trial court "in consideration of the equities between the taxpayer and the stock holders" adjusted the fair market value for the purpose of calculating the bond discount to $80.00 per share.

█ GM&O argues that the District Court should not have increased the price of the stock over and above the price that it traded at on the NYSE. The lower court ruled that the fair market value of the preferred shares was higher than the NYSE price because the stockholders were unaware of the tax implications of the exchange at the time the debentures were issued.[27] We believe, however, that ignoring market quotations is inconsistent with *National Alfalfa.*

The market provides a forum for the economic forces of supply and demand to act upon goods, such as securities, to determine objectively how much of one is worth so much of another. The market performs that function at maximum efficiency when each entrant is entirely free to participate or not. In *National Alfalfa* the Supreme Court, after listing several factors that affect the value of securities, stated: "[N]ormally, the market itself performs this evaluative process." 417 U.S. at 151, 94 S.Ct. at 2138. *National Alfalfa* then was "intended to avoid the very type of 'battle of experts' on the nebulous issue of market value which took place in this case." *Fed-Mart Corp. v. United States,* S.D.Cal., 1975, 75–2 U.S.T.C. ¶ 9531 at 87,558, aff'd, 9 Cir., 1978, 572 F.2d 235. When market quotations are available, as in our case, they should be the sole criterion for determining the value of a bond discount. Besides, discount results from the cost of borrowing at the *time of issuance* of the debentures. If later, the parties discover that the price was wrong because of the tax implications, no one should suffer a penalty.

---

original value of the preferred—at least seventeen years before it was exchanged for the debentures—is not relevant to determine the here and now cost of borrowing. The only test, if any, should be the difference in the face amount of the bond and its issue price.

This argument is now academic. We have already held that the original value of the stock was much less than the face amount of the debentures. Thus, even under the two-tier approach, the test will now be the difference in the face amount of the bond and its issue price as determined by the market value of the preferred stock.

**26.** R. at 253. The method of calculating the mean price of the preferred stock for each year in question was set out in the revised stipulation of facts as follows:

The market price per share of the Preferred Stock exchanged for Income Debentures during the year [is] computed by using the mean between the high and low prices for sales of such Preferred Stock on the New York Exchange as quoted in the *Wall Street Journal,* on the respective dates when each share of Preferred Stock was exchanged for an Income Debenture (or if no sales were reported on the New York Stock Exchange for that date, then the weighted average of the means between the highest and lowest prices for sales on the nearest date before and the nearest date after the exchange) is contained in column (4) of [Exhibits 11, 12, 13, 14, 15, 16] attached hereto.

J. Exh. 1 at ¶¶ 20, 21, 22, 23, 24, and 25.

**27.** The District Court opinion on valuation states in pertinent part:

Apparently, the taxpayer did not anticipate a bond discount savings at the time of the exchange nor until two or three years had elapsed thereafter. It is clear the stockholders were not informed and did not anticipate a possible tax liability to them in the event of a bond discount.

An additional factor stressed by the Government must enter into a figure of fair market value in this case. Any bond discount granted to the taxpayer could result in ordinary income and therefore additional tax liability of the shareholders who participated in the exchange. This created an upward thrust to the fair market value of the stock most difficult to assess. These equities between the taxpayer and the stockholders must not be overlooked.

R. at 261–62.

In summary, we hold: (i) GM&O is entitled to a deduction for discount on the exchange of debentures for its preferred stock. (ii) The amount of discount should be measured by the difference between the principal amount of the debentures and the fair market value of the preferred stock as determined by the mean NYSE price during the exchange period. We remand for the District Court to make the necessary calculations.

AFFIRMED IN PART, REVERSED IN PART, and REMANDED.