The **TEXSTAR CORPORATION**, Transferee of the assets of Unitex Industries, Inc. and its subsidiaries, Plaintiff,

v.

**UNITED STATES of America,**
**Defendant.**

Civ. A. No. 4–1795.

United States District Court,
N. D. Texas,
Forth Worth Division.

June 29, 1981.

Cox, Smith, Smith, Hale, & Guenther, J. Burleson Smith and J. Michael Wilkes, San Antonio, Tex., Richard D. Walker, Fort Worth, Tex., for plaintiff.

Kenneth J. Mighell, U. S. Atty., Ben A. Douglas, Atty., Tax Division, Dept. of Justice, Dallas, Tex., for defendant.

## AMENDED MEMORANDUM OPINION

BELEW, District Judge. .

Plaintiff, Texstar Corporation, as transferee of assets of Unitex Industries, Inc., brings suit seeking a refund of federal income taxes it alleges wrongfully assessed and collected. This action involves original issue discount and its proper valuation.

The Court makes the following findings of fact based upon the pleadings, stipulations, and evidence elicited at the trial.[1]

1. Unitex was incorporated on August 5, 1952, as I.C.T. Discount Corporation. Its name was altered to I.C.T. Corporation on May 11, 1955, and later changed to Unitex Industries, on August 21, 1957. On November 15, 1966, the assets of Unitex Industries, Inc. were purchased by Texstar Corporation, Plaintiff, which agreed to assume any and all prior liabilities for additional federal income taxes.

2. In 1952, I.C.T. had both common and preferred stock. The preferred stock, no par value, non-callable, non-voting, was entitled to a cumulative dividend of $0.72 per share per annum (or six (6) percent of the $12 purchase price).

3. During the period beginning January 1, 1953 and ending December 31, 1954, I.C.T. Discount Corporation had no "earnings and profits" within the meaning of that term as it is used in the Internal Revenue Code of 1954, § 316, 26 U.S.C. § 316, and no "earned surplus" as that term is defined under Texas Business Corporations Law, Tex.Bus.Corp.Act.Ann. art. 2.38 (1980). Illegal payments aggregating $1.49 per share, represented as dividends, were distributed to the preferred shareholders during that period.

4. During the early and mid-1950's, poor company management caused steep losses and resulted in a deficit in earned surplus of $4,346,857.56. In 1956, new management took charge of the corporation and began a program of rehabilitation.

5. On December 7, 1957, at a special meeting of preferred shareholders, a resolution was passed directing the management of Unitex to re-structure its capital formation. Those efforts culminated in a plan, approved by both the preferred and common shareholders, setting forth the following exchange: all present outstanding preferred stock, per share, for $2.00 cash and the issuance of a debenture, $10.00 face value, payable in twenty (20) years, bearing interest at the rate of five (5) percent per annum, with a sinking fund provision of at least two and one-half (2½) percent of the original issue debenture bonds each year, subordinated to all other debts of the company. This action was implemented in 1959, and had the effect of eliminating the deficit in earnings and profits while making a small capital surplus.

6. Plaintiff acquired the assets and assumed all liabilities of Unitex, Inc. in 1966. Subsequently, an Internal Revenue Service audit assessed deficiencies in income tax for the years 1963, ($170,484.16 plus interest of $66,393.07); 1964 ($65,307.44 plus interest of $21,514.77); 1965 ($94,443.03 plus interest of $25,446.57) and the short year January 1, 1966 through November 15, 1966 ($36,326.00 plus interest of $6,739.00). Plaintiff paid said tax on or about September 21, 1970, and later filed unsuccessful claims for refunds.

7. The parties have settled and resolved their controversy with respect to the allowance of the claimed bad debt deduction, Internal Revenue Code of 1954, § 165, 26 U.S.C. § 165, which is not related to the bond discount issue. The court hereby adopts and ratifies the parties' agreement.

8. The fair market value of Unitex preferred stock on December 31, 1959 was $3.99.[2]

### Jurisdiction

Jurisdiction is founded on Title 28, U.S.C. § 1346(a)(1) (1977).

---

1. This case was tried before the Honorable Leo Brewster in August 1972. While awaiting the final decision in the principal cases cited herein, Judge Brewster became ill and passed away in 1979 without rendering Judgment.

2. See testimony of Henry Moak Rollins pages 80 84, but particularly as set out on pages 86 87 of the transcript of the trial proceedings.

*Issues of Law*

I. Did an original issue discount arise upon the issuance of Unitex debentures and cash in exchange for its own outstanding preferred stock?

II. If such discount arose, what was the proper amount?

*Plaintiff's Complaint*

Plaintiff complains Defendant has erroneously assessed and collected federal income taxes and interest thereon of three hundred twelve thousand, six hundred twenty-nine and 44/100 dollars ($312,-629.44). Plaintiff characterizes the principal amount as a premium paid for the issuance of the debenture. In effect, Texstar propounds this as an original issue discount, represented by the difference between the fair market value of the Unitex stock and the stated redemption value at maturity of the debenture. As such, it is argued to be a cost or expense and under § 163 of the Internal Revenue Code, deductible interest. See Int.Rev.Code Reg. 1.163–3(a) (1968).

*Defendant's Answer*

The Government pictures this exchange as nothing more than a sophisticated adjustment of the corporation's capital accounts. It contends that upon original implementation of the plan, neither the corporation nor the shareholders anticipated this as an original issue discount. Rather, it was a masterful, albeit unsuccessful attempt at retroactive application of tax principles. The Government would show the intent of the parties controls; ten (10) percent is a reasonable discount rate; and under the facts and circumstances of this particular case, no bond discount existed because no new capital was acquired.

*Discussion*

I. This case is directly controlled by the definitional analysis of original issue discount in *Commissioner of Internal Revenue v. National Alfalfa Dehydrating and Milling Co.,* 417 U.S. 134, 94 S.Ct. 2129, 40 L.Ed.2d 717 (1974), and by the factual appli-

cation of the *National Alfalfa* factors as set forth in *Gulf, Mobile and Ohio R.R. Co. v. United States,* 579 F.2d 892 (5th Cir. 1978). In an opinion by Justice Blackmun, *National Alfalfa* probes with considerable depth the constructional concept of original issue discount. It would therefore be presumptuous for this District Court to attempt any further explanation or clarification on such subject. Simply stated, debt discount generally results from the sale by an issuer of its debt obligation at an issue price below the face amount of its obligation. The difference is referred to as the discount. Internal Revenue Code of 1954, § 1232(b)(1), (2), 26 U.S.C. § 1232(b)(1), (2). This may occur whether the issuer receives cash, stock, or other property. S.Rep.No. 91–552, 91st Cong., 1st Sess. 148 (1969); H.R. Rep.No. 91–413 (Part I), 91st Cong. 1st Sess. 110 (1969); U.S.Code Cong. & Admin.News 1969, p. 1645; Steuben, *Real Estate Planning,* at 689–691 (1974).

In *National Alfalfa,* pursuant to a recapitalization plan to eliminate arrearages on preferred shares, the taxpayer corporation required its shareholders to exchange their $50.00 par value, 5% cumulative preferred shares for $50.00 face value, 5% sinking fund debentures. At the time, the preferred apparently had a fair market value of approximately $33.00. The taxpayer claimed as discount the difference between the fair market value of the stock and the face amount of the debentures. The Tenth Circuit opinion, finding a premium in fact did exist, held for the taxpayer. The Supreme Court reversed, stating as determinative, "the relevant inquiry in each case must be whether the issuer-payer had incurred as a result of the transaction(s), some cost or expense of acquiring the use of capital," [3] Id., 417 U.S. at 147, 94 S.Ct. at 2136.

Justice Blackmun explained the transaction in *National Alfalfa* as merely a swap of one form of investment for another, identical in each insignificant feature. The face

---

**3.** In *National Alfalfa,* the court additionally held on the facts no additional capital had been acquired. Therefore, the proper emphasis derived from the Supreme Court opinion should focus upon the additional *cost incurred* rather than the additional *capital acquired.*

amount of the debentures equalled the stated value of the stock; the fixed interest on the debentures was equal to the cumulative dividend on the preferred; and the sinking fund provisions for both the preferred and the debentures were comparable. The Court construed the transaction as a reshuffling of the corporation's capital structure, determined no additional cost was incurred in retaining the old capital, and concluded, "... the substitution by NAD [National Alfalfa Dehydrating] of its debentures for its previously outstanding preferred, without more, did not erase an obligation to pay in excess of an amount previously committed, or establish the base upon which debt discount can arise," Id., at 154, 94 S.Ct. at 2139.

Within the framework of interpreting what constitutes original issue discount as set forth by the Supreme Court in *National Alfalfa*, the Fifth Circuit in *Gulf, Mobile and Ohio R.R. Co. v. United States*, 579 F.2d 892 (1978), carved three significant distinctions which would factually distinguish its case from *National Alfalfa*. In *GM & O*, during 1956, the company issued 5% income debentures to be exchanged on a voluntary basis for up to approximately 283,000 shares of *GM & O's* outstanding preferred stock. *GM & O* would cancel the preferred stock upon an exchange of one income debenture in the principal amount of $100.00 for one share of preferred stock with a stated value of $100.00. The Interstate Commerce Commission approved the transaction, and the company later filed an expectant tax refund [4] for the years 1959 and 1961 based upon a deduction for the amortizable bond discount arising from the exchange of the debentures for the preferred stock. The discount amount was computed by subtracting the total market value of the preferred stock from the total principal amount of the debentures. The Internal Revenue Service disallowed the claim and *GM & O* brought suit seeking a refund.

The Fifth Circuit, refusing to read *National Alfalfa* as establishing an absolute ban or discount in a corporate exchange of bonds for stock, Id., at 896; *Cities Service Co. v. United States*, 522 F.2d 1281, 1287 (2nd Cir. 1974), cert. denied, 423 U.S. 827, 96 S.Ct. 43, 46 L.Ed.2d 43 (1975), set out three distinguishable factors in applying *National Alfalfa* language to its own set of facts: (1) the original value received for each preferred share is less than the face amount of the debentures,[5] (2) an additional cost of borrowing, such as a sinking fund provision solely a feature of the debentures, and (3) a voluntary exchange of stock for bonds, with prices supported by market forces. The Circuit Court so found in this case and allowed *GM & O* a discount deduction.

Analyzing the facts before us, our train of thought must stay on track with the Supreme Court and Fifth Circuit. Therefore, if we are to construe a stock-for-bond exchange as an original issue discount (similar to the one in *National Alfalfa*), we must then line up our facts with the distinguishing factors in *GM & O*. This Court finds an original issue discount foundationed upon the following: (1) the original value received for each preferred share, based on all relevant criteria, was less than the face amount of the debenture. Unitex paid a $2.40 commission on each and every share of stock sold. This effectively reduced the amount of capital realized by the taxpayer for the bond issue ($12.00 − 2.40 = $9.60). *Helvering v. Union Pac. R.R. Co.*, 293 U.S. 282, 287, 55 S.Ct. 165, 167, 79 L.Ed. 363 (1934); *GM & O*, supra, 579 F.2d at 897 n.12; *United States v. St. Louis-San Francisco Ry. Co.*, 537 F.2d 312, 316–7 (8th Cir. 1976). In accounting terms, there was net paid-in capital of $9.60 per preferred share. As such, Unitex incurred an additional cost for the use of capital in the form of a premium.

(2) As in *GM & O*, under the exchange offer to the shareholders, only debenture holders would get the advantage of a sink-

4. See *GM & O*, supra, 579 F.2d at 894 n.4.

5. This Court takes note of the considerations and difficulties expressed by the 5th Circuit in

determining just what truly is the "original value received," *GM & O*, supra, 579 F.2d at 897 n.13.

ing fund. Apparently, as earlier set out, this was an important distinction to the Supreme Court. This benefit negated the mere substitution of one form for another that "did not create an obligation to pay in excess of an amount previously committed," *National Alfalfa,* supra, 417 U.S. at 154, 94 S.Ct. at 2139. We find it also represented an additional cost for the use of capital.

(3) Market forces acted on the exchange of stock for debentures. This last factor is critical and weighs most heavily upon the facts. Unitex had been suffering through hard times until 1957. Then, new management was installed and took charge. Great effort was made to purge the company of any dead weight. There was some success in this movement, but stability was still years away. Any long-term investment in Unitex carried a high degree of risk. It was in this predicament the new management approached the preferred shareholders. The corporation could not reorganize without their approval. After *two years* of negotiations, an agreement was reached.[6] Each shareholder would trade one share for $2.00 cash and a $10.00 debenture, redeemable in twenty years. This was a difficult choice and was reflected by the time it took to agree. Furthermore, a promise to pay $10.00 in 1979 by Unitex was not worth $10.00 in 1959. The corporation still possessed assets, and if liquidation occurred, they could assert their priority status and recognize some return. Additionally, the debenture was unsecured and subordinated to all other debt.

■ Under these circumstances, the preferred class voted to permit the exchange on the gamble their relatively low per-share worth would in the long-run yield a substantial gain. It is a decision investors every day make. And it is not for the Courts to judge if there was any more than ade-

quate consideration passed. An important element in the determination of *National Alfalfa,* easily overlooked, is the issuer's *financial condition,* including both its credit position and profit prospects. Unitex was in serious difficulty. It struck some hard-pressed deals in order to survive. And this distinguishes it from *National Alfalfa's* situation (a solid, going concern, attempting to expand its eastern producing areas, 417 U.S. at 138, 94 S.Ct. at 2132) or *GM & O's* (saving taxes, 579 F.2d at 894). Every transaction is different. Here, Unitex paid a premium, a high premium, in the form of interest to swing passage of the plans. Under *National Alfalfa* guidelines, the Court finds this a cost or expense to Unitex. The ultimate result of this difference was the corporation obligating itself to pay a debt greater in value than that which it received. It is irrelevant it re-claimed its own securities, because they still possessed value to the corporation. Consequently, any difference between this amount and the maturity value of the bonds should be and is treated as a discount.

■ II. The second issue involves a computation of the deductible discount. The amount and formula is set forth below:

Step 1

$3.99(a)
−2.00(b)
$1.99(c)

Step 2

$10.00(d)
−1.99(c)
$ 8.01(e)

*Legend :*

(a) Fair market value of Unitex stock on December 31, 1959, as found by the Court.

(b) Cash given as part of exchange plan.

(c) Issue price of bond.[7]

(d) Stated redemption value of debenture at maturity.

---

**6.** See *National Alfalfa,* supra, 417 U.S. at 151, 94 S.Ct. at 2138, where Justice Blackmun cited for comparison the District Court opinion in *GM & O, v. United States,* 339 F.Supp. 489 (S.D.Ala.1972) as well as another District Court decision from within the Fifth Circuit, *Southern Fertilizer and Chem. Co. v. Edwards,* 167 F.Supp. 879, 887 (M.D.Ga.1955), in which discount was allowed after the parties conducted

"arm's-length negotiations" to establish the amount of debentures and stock to be exchanged.

**7.** Note in *GM & O,* supra, 579 F.2d at 900, where the 5th Circuit stated "the market value of the preferred shares is a good yardstick for determining the real issue price of the debentures."

(e) Amount of original issue discount. From a reading of *National Alfalfa, GM & O*, and *Cities Service*, it is this Court's determination the above represents the correct amount of the original issue discount.[8] One additional point needs to be clarified: the $2.40 as a commission. The Court finds this an underwriting cost, and consequently, irrelevant to original issue discount.

Judgment is to be entered for the Plaintiff in accordance with this opinion.

### AMENDED JUDGMENT

In accordance with the Memorandum Opinion entered on this date, it is hereby ORDERED, ADJUDGED and DECREED that Plaintiff Texstar Corporation do have and recover of and from the United States of America the sum of $312,629.44, as stipulated by Plaintiff, bearing interest from September 21, 1970, as provided by law. Costs are taxed against the United States of America.

IT IS SO ORDERED.

---

8. This Court takes note both sides have moved for a new trial on the sole issue of the fair market value of the debenture. This is a 20 + year-old case. Sensing the jury originally had some difficulty with these issues and feeling confident of its own determination, the Court adjudges nothing significantly different would result.