The **TEXSTAR CORPORATION, Transferee of the assets of Unitex Industries, Inc. and its subsidiaries, Plaintiff-Appellee,**

v.

**UNITED STATES of America, Defendant-Appellant.**

No. 81–1277.

United States Court of Appeals, Fifth Circuit.

Oct. 7, 1982.
Rehearing Denied Nov. 4, 1982.

John F. Murray, Acting Asst. Atty. Gen., Michael L. Paup, William S. Estabrook, Stephen Gray, Attys., Tax Div., Dept. of Justice, Washington, D. C., for defendant-appellant.

Richard D. Walker, Fort Worth, Tex., J. Burleson Smith, J. Michael Wilkes, San Antonio, Tex., for plaintiff-appellee.

Before THORNBERRY, GEE and GARWOOD, Circuit Judges.

THORNBERRY, Circuit Judge:

The sole issue in this appeal is whether Texstar Corporation is entitled to a debt discount deduction under 163(a) of the Internal Revenue Code of 1954, 26 U.S.C. § 163(a),[1] based on its exchange of debenture bonds for all its outstanding preferred stock.

The exchange of debentures for preferred stock scrutinized in this case was carried out by Unitex Industries prior to Texstar's purchase of Unitex in 1966.[2] Unitex was first incorporated as I.C.T. Discount Corporation in 1952. At that time it issued both common and preferred stock. The preferred was cumulative, participating, no-par, non-voting stock. Each share of preferred was entitled to cumulative dividends of seventy-two cents per year prior to the payment of any dividends on common stock. And, if any dividend was paid to common

---

1. Section 163(a) authorizes a deduction for "all interest paid or accrued within the taxable year on indebtedness." Thus, corporations commonly deduct under section 163(a) the stated interest on debentures they issue. Original-issue discount may also arise when the issuer sells a debenture for less than its face amount.

> If bonds are issued by a corporation at a discount, the net amount of such discount is deductible and should be prorated or amortized over the life of the bonds. For purposes of this section, the amortizable bond discount equals the excess of the amount payable at maturity (or, in the case of a callable bond, at the earlier call date) over *the issue price of the bond.*

26 C.F.R. § 1.163 3(a)(1). This excess amount represents an additional cost to the corporation for the use of the money it is borrowing, and may be deducted as interest under § 163(a). The reasoning underlying this rule is straightforward. If the debenture sells at less than face value, it is because its stated annual interest rate was set too low. The market effectively compensates for the difference between the interest prescribed in the bond and the prevailing market rate for money by ensuring that the bond sells at less than par. Theoretically, the difference between the face value of the bond and its selling price is equivalent to the difference between the interest actually earned by the bondholder and what he would have earned at the prevailing market rate for money. *See Commissioner of Internal Revenue v. National Alfalfa Dehydrating and Milling Co.,* 417 U.S. 134, 150, 94 S.Ct. 2129, 2138, 40 L.Ed.2d 717 (1974).

2. In 1969, Congress amended the Internal Revenue Code, setting out detailed rules governing original-issue discount in a stock-for-bonds exchange. Tax Reform Act of 1969, Pub.L. 91–172, § 413(b), 83 Stat. 611. The relevant statute now provides in pertinent part:

> In the case of a bond or other evidence of indebtedness, or an investment unit as described in this paragraph (other than a bond or other evidence of indebtedness or an investment unit issued pursuant to a plan of reorganization within the meaning of section 368(a)(1) or an insolvency reorganization . . .), which is issued for property and which—
> (A) is part of an issue a portion of which is traded on an established securities market, or
> (B) is issued for stock or securities which are traded on an established securities market, the issue price of such bond or other evidence of indebtedness or investment unit, as the case may be, shall be the fair market value of such property. Except in cases to which the preceding sentence applies, the issue price of a bond or other evidence of indebtedness (whether or not issued as a part *of an investment unit) which is issued for property* (other than money) shall be the stated redemption price at maturity.

26 U.S.C.A. § 1232(b)(2). The statute applies only to exchanges occurring after May 27, 1969. Since the debentures in this case were issued before 1969, the statute does not apply in this case.

shareholders, preferred shareholders were entitled to receive the same dividend per share. The articles of incorporation further provided that upon liquidation of the corporation, preferred shareholders were entitled to receive twelve dollars per share prior to any distribution on the common stock with conditional participation in subsequent distributions. The preferred stock was sold door-to-door at twelve dollars per share by representatives of Jack Cage & Company. I.C.T. promised to pay the Cage Company a commission of twenty per cent of the sale price of each preferred share it sold.

I.C.T. experienced severe losses in the 1950's that resulted in a deficit in earned surplus of $4,346,857.56. In 1956, new management took charge of the corporation and began a rehabilitation program, and in 1957, I.C.T. changed its name to Unitex. The accumulated deficit nevertheless continued to make the prospect of any dividend remote. As a result, the shareholders in 1957 directed the formulation of a plan to restructure the capitalization of Unitex in a manner satisfactory to committees composed of common and preferred shareholders. Two years later, the shareholders approved a plan that eliminated the entire class of 126,023 preferred shares and gave the preferred shareholders, in exchange, two dollars in cash and a ten dollar debenture, bearing interest at the rate of five per cent per annum, for each share they returned. The plan enabled preferred shareholders to recoup the twelve dollars they had invested originally, though it required them to sacrifice their right to accrued unpaid dividends. The debentures, unlike the preferred shares, were subject to a sinking fund provision calling for the retirement of at least two and one-half per cent of the original issue of debentures each year. This exchange of preferred stock for debentures also eliminated the deficit in earnings and profits from the corporate balance sheet, improving the apparent financial condition of the company and allowing it to borrow money in the marketplace, as well as pay dividends to common shareholders from subsequent earnings.

In 1971, Texstar, as transferee of the assets and liabilities of Unitex, filed a complaint in the district court for the Northern District of Texas under 28 U.S.C. § 1346(a)(1) (1976) seeking a refund of federal income taxes allegedly improperly assessed and collected by the Internal Revenue Service between 1960 and 1966. Texstar claimed a deduction for original-issue discount. A jury trial was held in August 1972. In answers to special interrogatories, the jury found that Unitex did not incur a cost deductible as bond discount when it exchanged debenture bonds for preferred stock. The jury placed a fair market value on the preferred stock of $3.99 per share at the time of the transfer, December 31, 1959, and set the value of the preferred stock to Unitex on that date at $12.00, the face value of the bond plus two dollars cash. After numerous motions, judgment was delayed awaiting the Supreme Court's decision in *Commissioner of Internal Revenue v. National Alfalfa Dehydrating and Milling Co.*, 417 U.S. 134, 94 S.Ct. 2129, 40 L.Ed.2d 717 (1974). In 1979, the United States moved for a new trial based on a post-trial change in the law. The case was reassigned to a new judge who, relying on *Gulf, Mobile & Ohio Railroad Co. v. United States*, 579 F.2d 892 (5th Cir. 1978) [hereinafter *GM & O*] allowed Texstar a deduction for bond discount amounting to $8.01 for each of the 126,203 debentures that it issued. *Texstar Corp. v. United States*, 528 F.Supp. 75 (N.D.Tex.1981). The Court reached this figure by subtracting the estimated fair market value of the preferred stock at the time of the exchange from the face amount of the bond. *Id.* at 79. On appeal, the government argues that the district court erred in its application of the principles set forth in *National Alfalfa* and *GM & O*. We agree.

In *National Alfalfa*, pursuant to a recapitalization plan to eliminate arrearages on preferred shares, the taxpayer corporation required its shareholders to exchange their $50 par 5% cumulative preferred shares for

$50 face value 5% sinking fund debentures.[3] The taxpayer claimed a discount on the difference between the fair market value of the stock and the face amount of the debentures. After a detailed discussion of the appropriate considerations to be weighed by a court faced with this question, the Supreme Court held that the taxpayer was not entitled to bond discount. The primary inquiry in determining whether any bond discount exists is "whether the issuer-taxpayer has incurred, as a result of the transaction, some cost or expense of acquiring the use of capital." *National Alfalfa*, 417 U.S. at 147, 94 S.Ct. at 2136. The taxpayer argued that it had incurred a $17 cost in issuing the bonds because the $50 par preferred shares it received had an alleged fair market value of only $33.

The Supreme Court rejected this argument, concluding that in the absence of any actual or even attempted sales of debentures or purchases of the preferred shares by the taxpayer in the open market, the Court could only speculate as to what the market price and the investor reaction to such events would have been. *Id.* at 150, 94 S.Ct. at 2137. The Court based its refusal to speculate as to the fair market value of the bonds or the preferred shares on three grounds.

First, there was nothing in the record in *National Alfalfa* establishing the cash price at which the debentures could have been sold had they been offered for sale. Second, there was no evidence in the record to indicate that the taxpayer would have been able to purchase all its outstanding preferred on the open market, or at what price that quantity of stock would have been purchased in light of the impending exchange. The Court pointed out that the over-the-counter quotations found in the record did not reflect adequately the value per share when the entire block of preferred shares was outstanding. *Id.* at 150, 94 S.Ct. at 2138. Finally, the Court recognized that "when a corporation issues to its preferred shareholders its own new debt

obligations in exchange for outstanding preferred, the claimed fair market value of both securities is somewhat artificial since the exchange is effectively insulated from market forces by the intracorporate and private nature of the transaction." *Id.* "[I]mplicit in the concept of debt discount is the assumption, and indeed the requirement, that the transaction be subject to the exigencies of the competitive money market." *Id.* at 151, 94 S.Ct. at 2138. Since the debentures in *National Alfalfa* were not traded on the open market, and since the taxpayer presented no other evidence of the fair market value of the bonds at the time of their issuance, the Court concluded that "the requisite valuation of the property to be exchanged cannot occur in this intracorporate transaction and debt discount cannot be determined." *Id.* (Citations omitted).

Four years later, this Court in *GM & O* addressed the question of original-issue discount in the context of a stock-for-bonds transaction. Between 1957 and 1962, the taxpayer in *GM & O* redeemed approximately two-thirds of its outstanding $100 par value 5% cumulative preferred shares in exchange for an equivalent number of $100 face value 5% interest sinking fund bonds. Several years after the transaction, the taxpayer unsuccessfully applied for a tax refund based on an alleged original-issue discount computed by subtracting the total market value of the preferred during the exchange period from the total principal amount of the debentures.

Rejecting the Government's claim that *National Alfalfa* established an absolute prohibition against original-issue discount when a corporation exchanges its bonds for its own preferred stock, this Court instead applied the rule set out in *National Alfalfa* that bond discount arises only where the issuer-taxpayer incurs as a result of the transaction some cost or expense of acquiring the use of capital. 579 F.2d at 896 (citing *National Alfalfa*, 417 U.S. at 147, 94 S.Ct. at 2136). The Court concluded that the transaction in *GM & O* differed from

---

**3.** A sinking fund will increase the market price of the bonds by guaranteeing that a portion of

the bonds will be retired yearly. *GM & O*, 579 F.2d at 898 n.16.

that in *National Alfalfa* in three significant respects, and awarded the taxpayer a discount deduction measured as the difference between the principal amount of the debentures and the fair market value of the preferred stock determined by the mean New York Stock Exchange price during the exchange period.

The Court first noted that "since the original value received for the preferred shares was much less than the $100 face amount of the bonds, there was an additional cost for the use of capital." *Id.* at 898. Second, the debentures in *GM & O* were subject to a sinking fund provision while the preferred shares were not. Last, and most important, the stock-for-bonds exchange in *GM & O* "was completely voluntary and was affected by market forces." *Id.* at 899. Both the preferred shares and the bonds were actively traded on the New York Stock Exchange, and their market values "could be determined by anyone with a *Wall Street Journal.*" *Id.*

■ The same cannot be said of the present case. The debentures issued by Unitex were not traded on any market. As in *National Alfalfa*, there was nothing in the record establishing the cash price at which the debentures could have been sold had they been offered for sale. Texstar seeks to remedy this defect by arguing that since it offered one debenture plus $2 cash for each preferred share that it redeemed, the fair market value of each debenture can be calculated by subtracting $2 from the fair market value of each share of the preferred. However, none of the preferred stock was actively traded on an open market in sufficient quantity to permit the calculation of its market value. Texstar acknowledges in its brief that its own expert witness accorded little weight to the scattered quotations for the preferred on the over-the-counter market, because the market was too thin. Moreover, as in *National Alfalfa*, there is no evidence in the record to indicate that Unitex could have purchased all its outstanding preferred on the open market, or at what price that quantity of stock would have been purchased. In its denial of a discount deduction in *National Alfalfa*, the Supreme Court emphasized that the stipulated over-the-counter quotations for preferred stock "were quotations for what at most was a thin market, and were hardly representative of the fair market value of the entire 47,059 shares outstanding." 417 U.S. at 150, 94 S.Ct. at 2138.

Lacking a market value for its preferred stock, Texstar instead offers the uncontradicted testimony of its expert as to the value of the preferred at the time of the exchange.[4] However, this value, like a published market value, cannot serve as a basis for the calculation of original-issue discount unless it can be equated with the fair market value of the debentures. This Court in *GM & O* explained that "[a]ny assumption of an equivalence of the debentures and the preferred is unjustified where the transaction is insulated from the marketplace since the market forces which normally would bring about an equivalence of the two are absent." 579 F.2d at 900 (citing *Cities Service Co. v. United States*, 522 F.2d 1281 (2d Cir. 1974), *cert. denied* 423 U.S. 827, 96 S.Ct. 43, 46 L.Ed.2d 43 (1975)). In *GM & O*, where the individual shareholders relied on published market prices for both the stocks and the bonds in deciding whether to exchange their shares, we concluded that the transaction was "influenced by the 'exigencies of the competitive money market.'" *Id.*, (citing *National Alfalfa*, 417 U.S. at 151, 94 S.Ct. at 2138). As a result, we were able in that case to identify and calculate the additional cost of borrowing incurred by the taxpayer. Market forces acted through the participants in that transaction to effectively demonstrate the existence of a readily ascertainable discount. "[I]t is economically ... logical to assume that before deciding to trade the preferred shareholders compared the value of their stock to the value of the debentures in light of market prices and their own personal preferences."

---

4. The basis for this estimate included those factors which the Supreme Court in *National Alfalfa* suggested were essential to a determination of the value of untraded *debentures*. Of course, where the fair market value of the debentures can be directly ascertained, any estimation of the value of the preferred is superfluous.

579 F.2d at 899. In other words, if the shareholders in *GM & O* knew that one share of preferred was worth more than one debenture, they would not trade. Where the shareholders would not trade until the market value of the preferred fell below the face amount of the debentures, the fair market value of the debentures could be taken as the market value of the preferred at the time of the trade. Since the corporation in *GM & O* was obligated to repay the face amount of the debentures, the difference between that figure and the fair market value of the debentures represented an added cost of borrowing. Because the debentures could have sold at par if this added cost had instead been incurred in the form of a higher stated annual rate of interest on the debentures, the added cost could be viewed as an adjustment of the interest prescribed in the debenture and the prevailing market rate for money. This cost was consequently held deductible in *GM & O* under 26 U.S.C. § 163(a) as "interest paid or accrued within the taxable year on indebtedness." Only a process like this one, that reveals the presence of discount while permitting its calculation, can justify a finding of original-issue discount in an intracorporate exchange of stock for bonds.

Nothing like this process occurred in the present case. Here, the shares were redeemed *en bloc* pursuant to a plan approved by the shareholders, as in the insulated transaction in *National Alfalfa*. Nor was the exchange entirely free, being required by charter amendment opposed by a material minority of the preferred shares.[5] The estimate of the value of the preferred sought to be substituted for the fair market value of the debentures in this case was reconstructed many years after the transaction occurred. We are unable to perceive in this artificial scenario the play of market forces acting through informed agents to reveal a measurable additional cost of borrowing money.[6]

Since Texstar cannot change the history of this intracorporate transaction, a remand to determine the value of either the preferred shares or the debentures would be a pointless exercise.

REVERSED.

**5.** This dilutes the force of an assumption of equivalent value in a freely agreed arms-length exchange. And to this difficulty there must be added not only the absence of a market (for both the preferred and the debentures) but also the necessarily rather speculative evidence of this particular preferred's "intrinsic" value.

**6.** Texstar maintains that Unitex's poor financial condition just prior to the reorganization, and the two-year period during which the shareholders negotiated a reorganization plan with the corporation, furnish evidence that market forces acted on the exchange. But speculation as to the presence of general market forces "in the air" is a woefully inadequate substitute for the visible effect of the forces of supply and demand in "determin[ing] objectively how much of one [product] is worth so much of another." 579 F.2d at 892. This Court in *GM & O* held that because "the holders of preferred shares could examine the published market prices for both the preferred and the debentures before deciding to trade ... the market value of the preferred shares is a good yardstick for determining the real issue price of the debentures." *Id.* at 900. Where, as here, no market prices were available for either the debentures or the preferred, the reconstructed market value of the preferred cannot furnish an accurate measure of the real issue price of the debentures.

We find little merit in Texstar's claim that because the original issue price of the preferred shares was less than the face amount of the debentures, the corporation suffered a measurable cost or expense of obtaining the use of capital. In determining the amount of bond discount, this Court in *GM & O* relied upon the value of the preferred shares at the time the bonds were issued, not the original value received for the stock. 579 F.2d at 901.

Although the existence of a sinking fund as an incident of the debentures may offer added protection to the debenture holders, it is relevant only to a consideration of the fair market value of the debentures themselves. Since the fair market value of the debentures cannot be directly established here, this factual distinction is of little help in the determination of debt discount.

It is not enough to hint at the existence of discount. The existence of original-issue discount is inseparable from its determination.