**UNITED STATES STEEL CORPORA-
TION and Affiliated Companies**

v.

**The UNITED STATES.**

No. 97–84T.

United States Claims Court.

Dec. 22, 1986.

Dennis P. Bedell, Washington, D.C., attorney of record, for plaintiff. David B. Cubeta and Miller & Chevalier, Washington, D.C., of counsel.

Mildred L. Seidman, Washington, D.C., with whom was Asst. Atty. Gen. Glenn L. Archer, Jr., for defendant. David C. Hick-

man and Kevin B. Shea, Washington, D.C., of counsel.

## OPINION

MEROW, Judge:

This tax refund matter comes before the court on cross-motions for summary judgment. Upon consideration of the parties' briefs and supporting materials submitted for the record, it is concluded that plaintiff is entitled to a partial refund and summary judgment is granted, to the extent indicated herein, in favor of plaintiff. The parties' motions are, otherwise, denied.

### Facts

The plaintiff, United States Steel Corporation (USS), is a corporation engaged in the production and sale of a wide range of steel products. USS also engages in the production, refining, transportation and marketing of crude oil, natural gas and petroleum products, and various other businesses.

In 1901, USS' predecessor of the same name was organized under the laws of New Jersey.[1] At that time, it issued its common and preferred stock (and five percent gold bonds) in exchange for $25 million in cash, the stock of Federal Steel Company, National Steel Company, National Tube Company, American Steel and Wire Company of New Jersey, American Tin Plate Company, American Steel Hoop Company, American Sheet Steel Company, and the stock and bonds of the Carnegie Company.

On October 15, 1965, the plaintiff's stockholders were asked to approve and adopt a Joint Agreement of Merger entered into on October 1, 1965, by USS and U.S. Steel Company, a Delaware subsidiary of USS, which was to be effective on or shortly after January 1, 1966. The merger involved a change in the state of incorporation of USS from New Jersey to Delaware; the exchange of the outstanding $100 par value, 7 percent cumulative preferred stock of USS for 4⅝ percent subordinated debentures[2] at the rate of $175 principal amount of debentures for each share of preferred stock;[3] and, an increase in the par value of the common stock from $16⅔ to $30 per share. The accompanying proxy statement stated that, as of September 28, 1965, there were outstanding 3,602,811 shares of 7 percent cumulative preferred stock ($100 par value) and 54,138,137 shares of common stock ($16⅔ par value).

The agreement of merger was approved at the stockholders' meeting on November 24, 1965. The merger-recapitalization transaction was effective January 1, 1966, at which time the market value of a share of USS preferred stock had risen to about $165 a share.[4] In its 1966 annual report to its stockholders, USS stated that the merger resulted in the previously outstanding preferred stock being exchanged for $7.7 million in cash and for $622.8 million face amount of outstanding debentures. According to the report at page 26:

> The par value of the preferred stock exchanged was $270.2 million less than the principal amount of debentures to be issued. Of this amount, $234.5 million represents the excess of the December 31, 1965 market value of the preferred stock exchanged over its par value and has been charged to Income Reinvested

---

1. For purposes of this opinion, "USS" and "plaintiff" include United States Steel Corporation's predecessor of the same name which was merged into United States Steel Corporation effective January 1, 1966.

2. The debentures were subordinated as to principal, premium, if any, and interest to all Senior Debt.

3. Debentures were to be issued only in denominations or multiples of $100, and cash was to

be paid for fractional shares. Holders of five shares or less of preferred stock had the option of receiving all cash for their shares, at the rate of $175 per share. The debentures were nonredeemable for 10 years, and due in 1996.

4. The $165 per share approximate market value is taken from New York Stock Exchange quotations reported in the Wall Street Journal around January 1, 1966, the effective date of the merger.

in Business; the balance of $35.7 million has been charged to Costs Applicable to Future Periods and is being amortized over the life of the debentures.[5]

The merger also involved an increase in the par value of the outstanding common stock from $16⅔ per share to $30 per share for a total increase of $721.9 million. Of this amount, $704.1 million was transferred from Income Reinvested in Business and the remainder, $17.8 million, from Capital Surplus. * * *

On January 17, 1966, USS advised shareholders who had exchanged preferred stock for debentures that the "exchange is a transaction resulting in gain or loss of the difference between (a) the cost or other basis of preferred shares surrendered, and (b) debentures received, taken at market value, plus cash if any is received." With respect to USS, it is not disputed that this exchange resulted in no taxable gain or loss to the plaintiff.

In 1972, USS repurchased $12,500,000 face amount of the 4⅝ percent debentures for $8,437,500. Plaintiff figured that this amount reflected a price of $67.50 for each $100 face amount of debentures, which is equivalent to $118.13 for each $175 face amount of the debentures. Plaintiff reported the difference ($4,062,500) between the face amount of the debentures and the repurchase price in income in 1972. In 1982, plaintiff timely filed a claim for refund of tax paid on that amount. The Internal Revenue Service (IRS) took no formal action to allow or disallow the claim within the prescribed six month time period. Thus, the plaintiff filed a complaint with this court seeking to recover $848,367, which represents the alleged overpayment of federal income tax for the taxable year 1972, together with interest thereon.

*Discussion*

The only issue raised by the parties in their cross-motions for summary judgment is whether the plaintiff had to recognize income in 1972 when it repurchased its own debentures for an amount less than face amount. Specifically, did the plaintiff recognize taxable income within the meaning of 26 U.S.C. § 61(a)(12)[6] from discharge of indebtedness?

The plaintiff contends that the repurchase and retirement of the 4⅝ percent, $175 face amount, debentures resulted in no taxable gain, as the price paid upon the reacquisition ($118) was in excess of the amount per share paid in for the preferred stock for which the debentures were exchanged.[7] The government does not dispute the plaintiff's contention that USS' debenture bonds were substituted for the $100 par preferred stock and that this transaction was in the course of a non-taxable recapitalization. However, the government argues that, from their issuance in 1966, the debentures constituted a liability of the plaintiff in their face amount and, when repurchased by plaintiff for a lesser amount, the transaction result-

---

5. In spite of this statement in USS' report to shareholders in 1966, the plaintiff states in its reply brief that USS was allowed no discount deductions on the 4⅝ percent debentures. Thus, it appears the $35.7 million was not amortized over the life of the debentures. This information has significance because, as reported to shareholders, it indicates that, for purposes of taking deductions for debt discount, *i.e.*, amortizing the difference between the face amount of the debt and "issue price" thereof, the plaintiff considered the value of the stock in 1966 (about $165 per share) to be the "issue price" for the $175 face amount debentures exchanged for that stock.

6. 26 U.S.C. § 61(a)(12) provides:

"§ 61. *Gross income defined.*

(a) *General definition.*

Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items:

* * * * * *

(12) Income from discharge of indebtedness[.]"

7. The plaintiff contends that, in 1901, USS issued $100 par preferred stock for an amount of paid in capital which was less than the $100 par value. According to the plaintiff, the amount was not more than $96.375 per share of preferred stock. The government takes the position that additional proof is necessary to determine the amount of paid in capital USS received for the preferred stock in 1901.

ed in a reduction of liabilities which constituted taxable income.

■ The parties agree that the applicable regulations dealing with a corporation's sale and repurchase of its own bonds have been virtually unchanged since the regulations promulgated under the Revenue Act of 1918.[8] In addition, there is no dispute that, under the Treasury regulations, income from discharge of indebtedness is recognized when a corporation repurchases its bonds or debentures at a price less than their "issue price." The parties' dispute is over how to determine "issue price" within the meaning of the regulations.[9] Plaintiff argues the "issue price" of the debenture bonds it repurchased in 1972 is the amount paid in for the preferred stock in 1901 because the debentures were substituted in a tax-free transaction for such shares in 1966. The defendant claims the "issue price" of the debentures is the value to the plaintiff of the consideration it received on issuance of the debenture bonds in 1966, i.e., the value of the preferred stock at the time of the exchange.[10] Thus, defendant does not contend that the exchange of debt for stock in 1966 gave rise to gain, but contends that the repurchase of the bonds in 1972 gave rise to taxable gain, measured by the difference between the "issue" and repurchase prices.

Plaintiff takes the position that, in order to determine whether USS must recognize gain on repurchase of its debt, the "transaction as a whole," which includes the issuance of the preferred stock, the bonds-for-stock exchange, and the repurchase of the bonds, must be evaluated to determine if the overall transaction gave rise to an increase in USS' assets or economic gain. *Bowers v. Kerbaugh-Empire Co.*, 271 U.S. 170, 46 S.Ct. 449, 70 L.Ed. 886 (1926), is cited for the proposition that, if a "transaction as a whole" results in an overall loss, the retirement of debt at a cost less than face amount does not give rise to taxable income.[11] Defendant's response is that, for purposes of determining gain or loss on repurchase of debt, the "transaction as a whole" begins with the issuance of the indebtedness and ends with its repurchase. Treas. Reg. § 1.61–12(c). If the issue price exceeds the repurchase price, gain is recognized, and, if the repurchase price exceeds the issue price, loss is recognized.

■ As mentioned above, plaintiff contends the "transaction as a whole" gave rise to no gain because the approximate $118 repurchase price per $175 face amount debenture exceeded the amount USS received in 1901 on issuance of the preferred stock (about $100 per share, according to the plaintiff).[12] Defendant

8. Treas. Reg. § 1.61–12(c), as in effect at the time of the repurchase, provided in relevant part:
   "§ 1.61–12 *Income from discharge of indebtedness.*
   *     *     *     *     *     *
   (c) *Issuance and repurchase of corporate bonds.*
   *     *     *     *     *     *
   (3) If bonds are issued by a corporation and are subsequently repurchased by the corporation at a price which is exceeded by the issue price plus any amount of discount already deducted, or (in the case of bonds issued subsequent to Feb. 28, 1913) minus any amount of premium already returned as income, the amount of such excess is income for the taxable year."

9. With respect to bonds issued on or before May 27, 1969, neither the Internal Revenue Code nor the Treasury regulations provide specific rules for determining the issue price of bonds exchanged for property.

10. It is noted that the defendant initially argued that the issue price of the debentures for purposes of computing gain on their repurchase was their face amount, i.e., $175. However, in its reply brief, defendant has changed its position regarding this matter without explanation.

11. The parties disagree as to the continued viability of the *Bowers v. Kerbaugh-Empire Co.* case and as to the decision's applicability to the present case. For reasons stated in the body of this opinion, defendant's position regarding "transaction as a whole" is adopted. Furthermore, in light of *United States v. Kirby Lumber Co.*, 284 U.S. 1, 52 S.Ct. 4, 76 L.Ed. 131 (1931), the reasoning and the holding in *Kerbaugh-Empire Co.* do not compel the conclusion urged by the plaintiff.

12. In fact, plaintiff claims that the "transaction as a whole" resulted in a loss, and not a gain, because under its theory on "issue price," USS paid more to repurchase the debt than it took in

claims that the "transaction as a whole" gave rise to gain because the $118 repurchase price was less than the value of the preferred stock at the time of debt-for-stock transfer, which was about $165 per share. In the absence of explicit rules in the Treasury regulations for determining the "issue price" of bonds issued prior to 1969, the government's approach, which looks to the value of the consideration USS received in 1966 in exchange for issuance of the bonds, appears more reasonable than the plaintiff's approach for purposes of determining gain or loss on repurchase of the bonds, upon consideration of the Supreme Court's decision in *United States v. Kirby Lumber Co.*, 284 U.S. 1, 52 S.Ct. 4, 76 L.Ed. 131 (1931). In that case, the Supreme Court held that, where a corporation purchased and retired some of its own bonds for less than their par value, which bonds had been issued at par value, the difference was taxable gain or income. *Kirby Lumber Co.* involved the exchange of the company's own bonds, which it later repurchased, for its preferred stock. Thus, the decision in *Kirby Lumber Co.* was based on substantially the same facts as those presented in this case except that in *Kirby Lumber Co.* the issue price of the bonds was equal to their par value, whereas in this case the $175 par or face value of the bonds exceeds their $165 issue price, if the government's approach is adopted. What is not apparent from reading the court's decision in the *Kirby Lumber Co.* case is that the Supreme Court considered the original consideration received by the company for its preferred shares, for which the bonds were later exchanged, to be of any importance to its decision.[13] This is particularly cogent as *Kirby Lumber Co.*

was decided subsequent to the decision in *Bowers v. Kerbaugh-Empire Co.*, 271 U.S. 170, 46 S.Ct. 449, 70 L.Ed. 886 (1926), one of the cases upon which plaintiff relies to support its position that the consideration received by USS in 1901 for its preferred stock must be utilized to determine the 1966 issue price of the bonds. Thus, it appears the Supreme Court considered, for purposes of determining the gain on repurchase of the bonds under the Treasury regulations then in effect, that the "issuing price" for the bonds was the value of the consideration the company received (the preferred shares) in exchange for issuance of the bonds.

As mentioned above, the court's decision in *Kirby Lumber Co.* is based on the fact that the bonds were issued at their par value and were repurchased at a price less than their issuing price, face or par value, which were all the same in that case. In reaching its decision, the court upheld the applicable Treasury regulation then in effect as a correct statement of the law and distinguished the *Kerbaugh-Empire Co.* case, as follows, at 284 U.S. 2–3, 52 S.Ct. at 4:

By the Revenue Act of (November 23,) 1921, c. 136, § 213 (a) gross income includes "gains or profits and income derived from any source whatever," and by the Treasury Regulations authorized by § 1303, that have been in force through repeated reenactments, "If the corporation purchases and retires any of such bonds at a price less than the issuing price or face value, the excess of the issuing price or face value over the purchase price is gain or income for the

on issuance of the preferred stock. Plaintiff claims, by repurchasing the bonds at less than face value, USS only cut its losses, which does not result in taxable gain under *Bowers v. Kerbaugh-Empire Co.*, 271 U.S. 170, 46 S.Ct. 449, 70 L.Ed. 886 (1926). Under the decision reached herein, it is concluded the plaintiff's claim that USS suffered a loss on the "transaction as a whole" does not have merit.

13. According to one commentator on the case, neither party before the court in *Kirby Lumber Co.* even mentioned in their briefs what consid-

eration was received for the preferred stock when it was issued, let alone argued that such consideration determined the issue price of the bonds. The parties did agree that it was immaterial whether the company received cash or securities when it issued the bonds since it was agreed the bonds were issued for par. *See* Bittker, *Income From the Cancellation of Indebtedness: A Historial Footnote to the Kirby Lumber Co. Case,* 4 Journal of Corporate Taxation 124–29 (1977).

taxable year." Article 545(1)(c) of Regulations 62, under Revenue Act of 1921. See Article 544(1)(c) of Regulations 45, under Revenue Act of 1918; Article 545(1)(c) of Regulations 65, under Revenue Act of 1924; Article 545(1)(c) of Regulations 69, under Revenue Act of 1926; Article 68(1)(c) of Regulations 74, under Revenue Act of 1928. We see no reason why the Regulations should not be accepted as a correct statement of the law.

In *Bowers v. Kerbaugh-Empire Co.*, 271 U.S. 170 [46 S.Ct. 449], the defendant in error owned the stock of another company that had borrowed money repayable in marks or their equivalent for an enterprise that failed. At the time of payment the marks had fallen in value, which so far as it went was a gain for the defendant in error, and it was contended by the plaintiff in error that the gain was taxable income. But the transaction as a whole was a loss, and the contention was denied. Here there was no shrinkage of assets and the taxpayer made a clear gain. As a result of its dealings it made available $137,521.30 assets previously offset by the obligation of bonds now extinct. We see nothing to be gained by the discussion of judicial definitions. The defendant in error has realized within the year an accession to income, if we take words in their plain popular meaning, as they should be taken here. *Burnet v. Sanford & Brooks Co.*, 282 U.S. 359, 364 [51 S.Ct. 150, 151, 75 L.Ed. 383 (1931)].

Thus, the court found that the taxpayer in *Kirby Lumber Co.* made a clear gain when it repurchased its debt at less than face value because assets previously offset by the obligation of the bonds were made available as a result of the repurchase at less than face value. A similar conclusion may be reached in the present case since USS repurchased its debt at less than face value with the result that assets previously offset by those obligations were made available thereby. In this regard, as the court found in *Kirby Lumber Co.*, USS made a clear gain. However, the amount of the gain must be measured by the excess of the value of the consideration received by USS at the time of the bonds-for-stock exchange in 1966 over the repurchase price, and not by the excess of the face value of the bonds over the repurchase price, because the bonds were not issued at par or face value as they were in *Kirby Lumber Co.*[14]

Plaintiff argues that *Kirby Lumber Co.* is not applicable in this case to find taxable gain based on *Fashion Park, Inc. v. Commissioner*, 21 T.C. 600 (1954). In *Fashion Park*, the Tax Court had before it the following facts: Preferred stock was issued by the taxpayer in exchange for preferred stock of a predecessor corporation, which had been issued for $5 per share. When dividend arrearages on the preferred stock amounted to $17.50 per share, the taxpayer exchanged one $50 twenty-year debenture plus $10 in cash for each share of preferred which also had a par value of $50. Some of the debentures were repurchased at an average price of $47.32 each. The court also had before it the government's concession that the debentures were to be considered as having been issued at a price of $5 each, the original issue price of the preferred stock of the predecessor corporation, instead of the $50 par or liquidation value, as carried on its books. 21 T.C. 603. Thus, in *Fashion Park*, the government conceded the issue price question, whereas, in the present case, it is the very crux of the parties' dispute. The government in *Fashion Park* argued that, irrespective of the issue price, the bonds constituted a liability of the taxpayer in their face amount and when repurchased by the taxpayer for a lesser amount, the transaction resulted in a reduction of liabilities which constituted taxable income mea-

14. In *Commissioner v. Tufts*, 461 U.S. 300, 103 S.Ct. 1826, 75 L.Ed.2d 863 (1983), a case which was not decided on cancellation-of-indebtedness grounds, the court states at 309, n. 6, 103 S.Ct. at 1832, n. 6: "[I]t appears settled that the reacquisition of bonds at a discount by the obligor results in gain only to the extent the issue price, where this is less than par, exceeds the cost of reacquisition." The court is quoting J. Sneed, *The Configurations of Gross Income* 319 (1967).

sured by the difference between the repurchase price and the face of the obligations. The Tax Court did not agree. The court, in distinguishing *Kirby Lumber Co.*, said at 21 T.C. 604–05:

> In that case the corporate bonds involved had been issued at par and were retired at a figure below the price received. There the issuing corporation after the retirement stood possessed of so much of the consideration which it had received upon issuance as exceeded the price it paid to purchase and retire the bonds. On these facts that decision was rendered. Any such difference between the issued and face price paid for their cancellation was held to have been realized as an addition to surplus and consequently was taxable gain. In that case there was in fact an actual gain to the corporation by the transaction.
>
>   *   *   *   *   *   *
>
> In the case at bar the petitioner has secured the settlement and discharge of its bond liability at a figure below its face amount. If by reason of this transaction it stands now possessed of something in excess of what it had before, as was the case in *Kirby Lumber Co.*, there would be no question of the application of the rule in that case. Here, however, the amount received originally as the basis of the obligation must be considered as $5 for each bond, and although the bonds represented a corporate obligation in their face amount, the retirement of that obligation for a lesser amount by a payment far in excess of the amount received upon the assumption of the liability does not in fact leave the petitioner with an increase in assets over what it had before.

(Underscoring in original.)

The Tax Court based its decision in *Fashion Park* on the fact that the price paid by the taxpayer to repurchase the bonds, although less than the face amount of the bonds, exceeded the amount of cash received for the original preferred stock of the predecessor corporation. Based on that finding, the court stated the taxpayer did not have an increase in assets and, thus, the difference between the face amount of the bonds and the repurchase price was not taxable under the *Kirby Lumber Co.* decision.

Obviously, considering the factual similarities, the plaintiff argues that this court should follow the Tax Court decision in *Fashion Park*. Just as obvious, perhaps, is the defendant's position that once the government in *Fashion Park* conceded that the issue price of the bonds was less than the repurchase price, the Tax Court had no choice but to find there was no cancellation of indebtedness income. For the following reasons, the Tax Court decision is not followed.

The Tax Court's decision in *Fashion Park* in relation to the *Kirby Lumber Co.* case was reviewed by a well-known and respected commentator on corporate tax law, Boris I. Bittker, in his article *Income From the Cancellation of Indebtedness: A Historical Footnote to the Kirby Lumber Co. Case*, 4 Journal of Corporate Taxation 124 (1977). Professor Bittker found, at 124–25, that:

> For many years, the *Kirby Lumber Co.* case, holding that the taxpayer realized taxable income on repurchasing its bonds for less than their par value (the amount at which they had been issued), has been thought to involve bonds issued for cash. In *Comm'r v. Rail Joint Co.*,[15] for example, the Court of Appeals for the Second Circuit refused to apply *Kirby Lumber* to the "spread" between the face value of bonds and their repurchase price where the bonds were issued as a dividend to the issuing corporation's shareholders.   * * *
>
> Similarly, in *Fashion Park, Inc. v. Comm'r*, the Tax Court held that the difference between the face amount of certain debentures and their repurchase

---

15. *Commissioner v. Rail Joint Co.*, 61 F.2d 751 (2d Cir.1932), *aff'g Rail Joint Co. v. Commissioner*, 22 B.T.A. 1277 (1931), is a case relied upon by the Tax Court in reaching its decision in *Fashion Park, Inc. v. Commissioner*, 21 T.C. 600 (1954).

price was not taxable under *Kirby Lumber*, because the debentures were issued in exchange for the taxpayer's preferred stock and dividend arrearages thereon, and the debentures were repurchased for more than the amount originally received for the preferred stock.

\* \* \* \* \* \*

There are other cases similarly assuming, either explicitly or implicitly, that the taxpayer in *Kirby Lumber* received cash on issuing its bonds and paid less than that amount to repurchase them, and holding that the case does not apply in the absence of such a cash spread.

(Footnotes omitted.)

As already mentioned, Professor Bittker points out in his article at 126 that the bonds in *Kirby Lumber Co.* "were not issued for cash, but in exchange for the taxpayer's preferred stock, on which there were dividend arrearages." He goes on to state at 126–29:

The mistaken notion that the case involved a spread between cash received and cash paid out stems from the laconic complaint, which alleged only that the bonds "were issued at par," and the findings of fact by the Court of Claims, which repeated this statement and described the repurchase price as "$137,521.30 less than the issuing price." In deciding the case, the Court of Claims had no reason to focus on the nature of the consideration received for the bonds, since it enunciated the broad doctrine (subsequently rejected) that "the excess of the issuing price of the bonds over the purchase price," though constituting "gain" to the issuer, was not "income" within the meaning of the Sixteenth Amendment, as interpreted by *Eisner v. Macomber* [252 U.S. 189, 40 S.Ct. 189, 64 L.Ed. 521] and *Bowers v. Kerbaugh-Empire Co.*

\* \* \* \* \* \*

The Record on Appeal in *Kirby Lumber*

Thus, when the Supreme Court heard the case, the taxpayer's assertion that the bonds were issued to retire preferred stock and the dividend arrearages thereon was not supported by the formal record, but neither was the government's assertion in its petition for certiorari that the bonds were issued for cash; and both parties agreed that the nature of the consideration was immaterial.

Given this background, it is highly doubtful that the Supreme Court intended to restrict its opinion in the *Kirby Lumber* case to a repurchase of bonds issued for cash. The word "cash" does not appear in the opinion, and the Court's neutral terms ("par value," "issuing price," and "face value") apply with equal accuracy to bonds issued for cash and bonds issued for other lawful consideration. In stating that "as a result of its dealings [the taxpayer] made available $137,521.30 assets previously offset by the obligation of bonds now extinct," the Court did not imply that more cash was received on issuing the bonds than was paid out when they were repurchased, but only that the mortgage securing the bonds was reduced by $137,521.30 more than the taxpayer paid for the repurchased bonds and that the shareholders' equity increased by this amount. Having been argued by both parties on the premise that the nature of the consideration received for the bonds was irrelevant (and on a record that did not address itself to this issue), the case almost certainly was decided on the same assumption.

(Footnotes omitted.)

Professor Bittker explains that the Tax Court decision in *Fashion Park* was based on the premise that *Kirby Lumber Co.* only applies when there is a cash "spread," *i.e.*, when a company receives cash on issuing its bonds and pays less than that amount to repurchase them. Thus, the Tax Court looked at the original cash transaction involving preferred stock of a predecessor corporation, which had been issued at $5 per share, compared that cash price to the amount of cash paid to repurchase some of its bonds years later (about $47 per bond) and found, since the cash price

on repurchase exceeded the cash received on issuance of the original preferred stock, there was no cancellation of indebtedness income. An approach which focuses only on cash transactions ignores, in a case like *Fashion Park* (and in the present one), that the company, through business dealings in its own obligations in the interim between issuance of the preferred shares and its repurchase of the bonds at less than face value, was able to exchange $50 face value bonds for preferred stock of equal par value. It must be assumed from a business point of view, and in the absence of evidence that a gift or debt discount was involved with respect to issuance of the debt, that the corporation believed it was receiving consideration of equal or like value on the exchange of bonds for stock. Moreover, the same assumption may be made in the present case. In sum, the Tax Court in *Fashion Park* did not take into account what consideration the company received when it issued its bonds, *i.e.,* the value of the preferred stock. Presumably, the court, at least in part, did not consider the value of the preferred stock at the time of the exchange because the government conceded that the $5 per share price for the original preferred stock was to be considered the issue price of the bonds, which had a $50 face value. The government's position before the Tax Court in *Fashion Park* that, irrespective of the consideration received in exchange for issuance of the bonds, if the bonds were repurchased for less than their face value, there is cancellation of indebtedness income, is clearly not its position in the present case. No such concession regarding issue price is present in this case. *Compare Forward Communications Corp. v. United States,* 221 Ct.Cl. 582, 641, 608 F.2d 485, 518 (1979) (opinion relies on government concession).

While the defendant relies on *United States v. Kirby Lumber Co.,* 284 U.S. 1, 52 S.Ct. 4, 76 L.Ed. 131 (1931), to support its position, it also refers to a line of cases involving the existence and/or amount of amortizable debt discount, in which various courts have had to determine the "issue price" of debt. In this connection, the background on the applicable regulations in effect in 1966, at the time of the exchange (Treas. Reg. § 1.61–12(c)) and in effect in 1972, at the time of the repurchase (Treas. Reg. § 1.61–12(c) and § 1.163–3, as modified and added by T.D. 6984, 1969–1 Cum. Bull. 38), has been briefed. This material shows that "[p]rior to the publication of T.D. 6984, the consequences of a corporation's issuance and repurchase of its own debt were set out under the statutory section dealing with recognition of income. Since the publication of T.D. 6984, the income aspect of such issuance and repurchase has been set out under Section 61(a)(12), providing for discharge of indebtedness income, whereas the deduction aspect has been set out under Section 163 (26 U.S.C.), providing for the deduction of interest."

Prior to being divided into income and deduction sections in 1969, the regulations provided that, if bonds are issued at a discount, such discount should be amortized over the life of the bonds; if a corporation repurchases its own bonds at a price in excess of the issue price plus discount amortized prior to repurchase, the excess of the purchase price over the issue price, adjusted for amortized discount, is a deduction for the taxable year; and, if a corporation repurchases its own bonds at a price below the issue price plus discount amortized prior to repurchase, the difference is a taxable gain.

Based on this background discussion, defendant argues that a determination as to the "issue price" of debt would be the same whether the dispute before the court involved the question of gain or loss on the repurchase of debt or the existence and amount of amortizable discount on the issuance of debt. *Cities Service Co. v. United States,* 443 F.Supp. 392 (S.D.N.Y.1978), *aff'd per curiam,* 586 F.2d 967 (2d Cir. 1978), supports this argument. Thus, defendant urges reliance upon a line of debt discount cases, all involving debt/equity exchanges in some form or another, in which the value of either the stock or bonds at the time of the exchange determined

whether there was discount, measured against the face amount of the debt. The cited cases therefore reject the theory that the amount paid in originally for the stock is determinative of the "issue price" of debt later exchanged for that stock. *Fed-Mart Corp. v. United States*, 572 F.2d 235 (9th Cir.1978), and *Texstar Corp. v. United States*, 688 F.2d 362 (5th Cir.1982), held that no discount was incurred. In *Texstar Corp.*, the Fifth Circuit expressly rejected the plaintiff's claim that discount was incurred based on the difference between the amount originally paid in for the stock and the face amount of the debentures. 688 F.2d at 367 (n. 6). Two cases have held that debt discount was created. *See Cities Service Co. v. United States*, 522 F.2d 1281 (2d Cir.1974), *cert. denied*, 423 U.S. 827, 96 S.Ct. 43, 46 L.Ed.2d 43 (1975), subsequent proceedings on remand, 443 F.Supp. 392 (S.D.N.Y.1978), *aff'd per curiam*, 586 F.2d 967 (2d Cir.1978); *Gulf, Mobile & Ohio R.R. v. United States*, 579 F.2d 892 (5th Cir.1978).

Defendant also relies on Court of Claims cases for the proposition that:

> [T]he amount originally paid in for the stock was the floor in computing debt discount but that the stock could have a greater value in the eyes of the corporation. * * *

*St. Louis-San Francisco Ry. v. United States*, 195 Ct.Cl. 343, 349, 444 F.2d 1102 (1971), *cert. denied*, 404 U.S. 1017, 92 S.Ct. 678, 30 L.Ed.2d 665 (1972); *Missouri Pacific R.R. v. United States*, 193 Ct.Cl. 257, 433 F.2d 1324 (1970), *cert. denied*, 402 U.S. 944, 91 S.Ct. 1618, 29 L.Ed.2d 112 (1971). Moreover, the defendant claims that *Commissioner v. National Alfalfa Dehydrating & Milling Co.*, 417 U.S. 134, 94 S.Ct. 2129, 40 L.Ed.2d 717 (1974), supports the government's position that the amount originally paid in for the stock only sets the floor or establishes the minimum amount for the issue price. In *National Alfalfa*, the taxpayer corporation argued that debt discount was created when it issued a $50, 5 percent debenture in exchange for its previously existing $50 par 5 percent preferred shares, traded on the over-the-counter market at $33 on the date of the exchange. The Supreme Court upheld the government's denial of debt discount deductions even though the over-the-counter market value of the stock at the time of the exchange was quoted to be less than the face value of the bonds. In this case, the court attached great importance to the fact that the company's stock and debentures were not traded on the open market and thus values at the time of the exchange could not be accurately determined. In the present case, USS stock and bonds are traded on the open market so we do not have the same valuation difficulties as the Supreme Court found in *National Alfalfa*.

In summary, the government claims that these cases establish that the amount originally paid in for the preferred stock in 1901 establishes the "floor" for setting the issue price but not the "ceiling" or maximum amount at which the issue price may be set. Thus, if at the time of the bonds-for-stock exchange, the value of the stock has increased to approximate the value or face amount of the bonds being issued therefore, the corporation has received the equivalent in stock value in exchange for issuing the bonds. So, if bond "issue price" is the same whether gain or loss on repurchase or debt discount is at issue, it follows in this case that the original issue price of the preferred shares in 1901 sets a minimum for determining the issue price of the bonds in 1966. However, since the value of the stock was equal to the value of the bonds issued in exchange for the stock, USS received as consideration for issuing its debentures the equivalent in stock value. That is, USS received as consideration in 1966 more than an amount equal to the original price of the preferred stock.

After setting forth in some detail the government's arguments in this regard, it is concluded that, for the reasons stated in the rest of this opinion, it is not necessary to adopt this line of reasoning to resolve the "issue price" issue presented herein. However, this background discussion and the cases are included because they lend collateral support to the conclusion

reached. On the other side of the issue is *Erie Lackawanna R.R. v. United States,* 190 Ct.Cl. 682, 422 F.2d 425 (1970), a debt discount case which does not support the conclusion reached. However, the Court of Claims, at 190 Ct.Cl. 690, 422 F.2d 425, expressly did not hold what it would have decided if the amount originally paid in for the preferred stock was less than the face amount of the bonds issued in exchange for the stock. Thus, *Erie Lackawanna R.R.* would not be dispositive under the facts in this case where the amount paid in to USS in 1901 for the preferred shares was less than the face amount of the debt. Although the defendant disputes that the exact amount of capital paid in for the stock has been established, the government appears to agree that the face amount of the bonds exceeded the original issue price of the preferred shares.

■ As mentioned above, *Kirby Lumber Co.* has been relied upon for the decision reached herein that the consideration received by USS in the 1966 bonds-for-stock exchange determines the issue price of those bonds. Thus, the value of the preferred shares USS received in exchange for issuing its debentures in 1966 (about $165 per share) is to be considered the issue price of those debentures for purposes of computing taxable gain on repurchase of the debentures in 1972 pursuant to the Treasury regulations.

### *Conclusion*

■ When a corporation extinguishes its own debt at less than face value, it has cancellation of indebtedness income. 26 U.S.C. § 61(a)(12). However, the amount of taxable gain recognized cannot exceed the difference between the issue price, which in this case is the value of the consideration the company received when it issued its bonds, and the repurchase price of those bonds. Treas. Reg. § 1.61–12(c)(3). Thus, since USS included in income an amount equivalent to the difference between the $175 face amount of the debt and the $118 repurchase price per bond, the plaintiff is entitled to a refund for an amount equivalent to the difference between the face amount of the debt (about $175 per debenture) and the lesser market value of the preferred shares at the time of the exchange (about $165 per share) plus applicable interest, as provided by law. In other words, under the decision herein, the plaintiff should have included in income only the difference between the value of the preferred stock in 1966 (the issue price of the bonds) and the repurchase price of the bonds in 1972.

Therefore, it is ORDERED:

(1) Plaintiff's motion for summary judgment as to entitlement for a refund is granted to the limited extent cited herein, and the parties' motions are, otherwise, denied;

(2) Counsel shall file a "Status Report" with the clerk within 30 days indicating the procedure(s) proposed to determine the refund amount involved in order to obtain the entry of a final judgment in this matter.